UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| MARK R. STINNETT | ) | Civil No. 11-1372-WQH(WVG) |
| | ) | |
| Plaintiff, | ) | REPORT AND RECOMMENDATION: |
| v. | ) | |
| | ) | DENYING PLAINTIFF'S MOTION |
| MICHAEL J. ASTRUE, Commissioner | ) | FOR SUMMARY JUDGMENT |
| of Social Security, | ) | (DOC. #14) |
| | ) | |
| Defendant. | ) | GRANTING DEFENDANT'S MOTION |
| _____ | ) | FOR SUMMARY JUDGMENT |
| | | (DOC. #15) |

I

<u>INTRODUCTION</u>

Plaintiff Mark R. Stinnett (hereinafter "Plaintiff"), filed a Complaint for Judicial Review and Remedy On Administrative Decision under the Social Security Act [42 U.S.C. § 405(g)]. Defendant Michael J. Astrue (hereinafter "Defendant"), filed an Answer to the Complaint and the Administrative Record (hereafter "Tr."), pertaining to this case. Plaintiff has filed a Motion for Summary Judgment. Defendant has filed an Opposition to Plaintiff's Motion for Summary Judgment and a Cross-Motion for Summary Judgment.

1    The Court, having reviewed Plaintiff's Motion for Summary Judgment,

2    Defendant's Opposition to Plaintiff's Motion for Summary Judgment,

3    Defendant's Cross-Motion for Summary Judgment, and the Administrative

4    Record filed by Defendant, hereby finds that Plaintiff is not entitled

5    to the relief requested and therefore RECOMMENDS that Plaintiff's Motion

6    for Summary Judgment be DENIED and Defendant's Motion for Summary

7    Judgment be GRANTED.

8                                   II

9                           PROCEDURAL HISTORY

10       On March 6, 2007, Plaintiff filed an application for Disability

11   Benefits and a Period of Disability under Title II of the Social

12   Security Act (Act).  Plaintiff also applied for Supplemental Security

13   Income (SSI) benefits under Title XVI of the Act, alleging that he was

14   disabled since June 11, 2006.  The Commissioner of Social Security

15   denied his application initially and upon reconsideration.  Plaintiff

16   requested a hearing before an Administrative Law Judge ("ALJ").   On

17   December 18, 2009, Plaintiff, accompanied by his attorney, appeared at

18   a hearing before an ALJ.  On April 2, 2010, the ALJ issued his hearing

19   decision, concluding that Plaintiff was not disabled as defined under

20   the Act.  The ALJ's decision became the Commissioner's final decision

21   when the Appeals Council denied Plaintiff's request for review on April

22   21, 2011.

23                                  III

24                          ALJ'S FINDINGS[1]

25   The ALJ made the following pertinent findings:

26   1.   (Plaintiff) meets the insured status requirements
          of the Social Security Act through December 31,
27        2009.

28   _____

[1]The ALJ's findings are found at Tr. 14-22.

11cv1372

2.   (Plaintiff) has not engaged in substantial gainful activity since June 11, 2006, the alleged onset date.

This finding is based on the (Plaintiff's) testimony and his earnings record.

3.   (Plaintiff) has the following severe impairments: a seizure disorder, and status post multiple fractures from a June 14, 2006 motorcycle accident.

(Plaintiff)'s impairments affect him more than minimally; thus, they are considered to be severe.

(Plaintiff)'s medically determinable mental impairments of anxiety and alcohol abuse do not cause more than minimal limitation in the (Plaintiff)'s ability to perform basic mental work activities and are therefore nonsevere.

In making this finding, the (ALJ) has considered the four broad functional areas set out in the disability regulations for evaluating mental disorders and in section 12.00C of the Listing of Impairments (20 CFR, Part 404, Subpart P, Appendix 1).  These four broad functional areas are known as the "paragraph B" criteria. The first functional area is activities of daily living. In this area, the claimant has no limitation.  The next functional area is social functioning.  In this area,(Plaintiff) has mild limitation.  The third functional area is concentration, persistence or pace. In this area, (Plaintiff) has mild limitation.  The fourth functional area is episodes of decompensation.  In this area, (Plaintiff) has experienced no episodes of decompensation which have been of extended duration.

Because the claimant's medically determinable mental impairment causes no more than 'mild' limitation in any of the first three functional areas and 'no' episodes of decompensation which have been of extended duration in the fourth area, it is nonsevere.

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process.  The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing of Impairments.  Therefore, the following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

4.    (Plaintiff) does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

The (Plaintiff)'s musculoskeletal impairments do not meet or equal any of the 1.00 (musculoskeletal system) listings of impairments. His seizure disorder does not meet or equal Listing 11.02 (grand mal seizures) or Listing 11.03 (petit mal seizures).

5.    After careful consideration of the entire record, the (ALJ) finds that (Plaintiff) has the residual functional capacity to perform light work except (Plaintiff) can lift and carry 20 pounds occasionally and 10 pounds frequently. He can stand and walk for 6 hours out of an 8 hour work day and he can sit for 6 hours out of an 8 hour work day. He cannot climb ladders, ropes, or scaffolds; he can occasionally climb ramps and stairs; and he can occasionally stoop, crouch, and crawl. He should avoid all exposure to hazardous conditions such as working at heights or with dangerous machinery.

In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSRs 96-4p and 96-7p. The ALJ also considered opinion evidence.

In considering the (Plaintiff)'s symptoms, the ALJ must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment - i.e., an impairment that can be shown by medically acceptable clinical and laboratory diagnostic techniques - that could reasonably be expected to produce the claimant's pain or other symptoms.

Second, once an underlying physical or mental impairment that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the ALJ must evaluate the intensity, persistence, and limiting effects of (Plaintiff)'s symptoms to determine the extent to which they limit (Plaintiff)'s functioning. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the statements based on a consideration of the entire case record.

11cv1372

(Plaintiff) testified that he is 46 years of age.  He graduated from high school and attended college for one year.  He has worked in the past as a warehouse worker and sales representative.  He quit working on June 12, 2006 due to injuries from a motorcycle accident.  He currently drinks a few beers every week but does not drink excessively.  He had a seizure in 2004 due to drinking and stress.  He was on a golf course while on a business trip.  He blacked out and hit his head on a curb.  He was taken to the hospital by ambulance.  He filed a worker's compensation claim.  He had a seizure 7 months before the hearing, which was a minor episode.  He did not black out and he was not treated for his incident.  He alleges he cannot work due to chronic back pain.  He cannot concentrate and he has problems sitting.  He takes medications.  He has problems lifting.  He has a crushed vertebrae at T-7 of the thoracic spine.  His doctors have told him there is nothing that can be done, and he has to live in pain.  He has seen a psychiatrist because he has a fear of death and other problems.  He does not like to be alone and is fearful when driving, so he does not drive.  He has no driver's license because he lost it due to driving while under the influence at the time of the June 2006 accident.  He has not attempted to renew it because of his fear of seizures.  After he had a seizure, he returned to work in a warehouse.  After his motorcycle accident, the claimant moved to Redding.  He lives with his girlfriend in her house.  He takes Vicodin for pain.  Side effects include feeling tired, angry, and concentration deficits.  He currently drinks 8-12 beers a week.  He knows he cannot drink too much because of his medications.  He has difficulty working on a computer keyboard.  After sitting at a computer, he has a burning sensation in has back after 45 minutes.  His condition worsens as the day goes on.  He has to rest every 30 minutes for 15-20 minutes.  He does not sleep well at night due to nightmares.  He goes to bed at 11:30pm and arises at 10:00am.  He sleeps for 4-6 hours.  He is often tired and naps during the day.  He does not get dressed 4-5 days out of the month due to feeling tired and having difficulty functioning.  He would not be able to go to work every morning.  He would take excessive breaks and need to frequently change position.  He might have to lie down while at work.  His doctors do not want to do surgery as it might cause more pain and loss of movement.  He spends most of his day on the couch reading, watching television, and dealing with the pain.  He has pain and discomfort when riding in a car.  He wants to see a neurosurgeon but his current treatment is for medications only.  His health insurance does not pay for physical therapy.  He has hepatitis C, but this condition does not affect him.

After careful consideration of the evidence, the undersigned finds that the (Plaintiff)'s medically determinable impairments could reasonably be expected to

11cv1372

cause the alleged symptoms; however, (Plaintiff)'s statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

The evidence of record reflects that on September 29, 2004, the (Plaintiff) reportedly suffered a seizure during a business trip. (Plaintiff) had been drinking six to seven beers per day for two days prior to the incident; he had the seizure later that morning. In May 2004, the claimant said he had been drinking heavily for three weeks, then stopped drinking for two days when he had his first seizure.

On November 1, 2004, a consulting neurologist examined (Plaintiff), whose examination was normal. The neurologist concluded that the seizures were due to alcohol use and withdrawal, lack of sleep and increased work stress. The neurologist concluded that (Plaintiff) should not be exposed to extreme stress, work at heights, be in water without supervision, drive, and engage in excessive alcohol consumption. (Plaintiff) was placed on anti-seizure medication, which controlled his symptoms. A November 24, 2004 electroencephalogram showed no evidence of seizure activity. Magnetic resonance imaging (MRI) of the brain was negative.

On March 9, 2005, another neurologist conducted a neurologic consultative examination pursuant to the claimant's workers' compensation claim. On examination, the (Plaintiff)'s blood pressure was 140/90. Lung and heart sounds were normal. Sensation, gait and reflexes were also normal, as was a cerebellar examination. The consultative neurologist concluded that (Plaintiff)'s seizure activity was non-industrial in nature and likely precipitated by (Plaintiff)'s chronic alcohol use and sleep deprivation.

More current records reflect that (Plaintiff) reportedly had one seizure in 2008, but he is not taking anti-seizure medications.

On June 11, 2006, (Plaintiff) sustained multiple fractures to the thoracic spine, third rib, left scapula, and left clavicle in a motor cycle accident. (Plaintiff) had no memory of the accident, but apparently he had been drinking alcohol and driving at 65 miles per hour when the accident happened. (Plaintiff) also had some post concussive symptoms, including confusion, but a computerized tomography[2/] scan of the head was negative.

---

[2/]Computerized Tomography (CT) scanning, also called computerized axial tomography (CAT) scanning, is a medical imaging procedure that uses x-rays to show cross-sectional images of the body. A CT imaging system (continued)

No surgery was indicated, and (Plaintiff) remained in the hospital for three days.

By August 24, 2007, (Plaintiff) reported only mild back pain.  A physical examination revealed no neurological deficits, and (Plaintiff) had full strength.  However, (Plaintiff) continued to have pain, so his physician recommended a kyphoplasty.[3]  On August 15, 2007, a physical examination revealed a kyphotic curvature[4] related to the fracture, but otherwise, the physical examination revealed no weakness, sensory loss, or asymmetric reflects.  Since it had been 14 months since the injury, the fracture was solid, so his neurosurgeon no longer recommended surgery; instead, it was recommended that (Plaintiff) remove the back brace and begin physical therapy and exercises.

On January 16, 2007, Dr. Ronald Kent conducted a neurological consultative examination as an agreed medical examiner, pursuant to (Plaintiff)'s seizure activity; (Plaintiff) also reported having nightmares due to the seizures.  On examination, (Plaintiff)'s blood pressure was 140/90; his height was 5'7", and his weight was 152 pounds.  (Plaintiff) had tenderness of the mid thoracic spine and paraspinous musculature[5] region. (Plaintiff)'s lumbosacral spine and neck were non-tender.

---

(continued)
produces cross-sectional images or "slices" of areas of the body, like the slices in a loaf of bread. These cross-sectional images are used for a variety of diagnostic and therapeutic purposes.  U.S. FOOD AND DRUG ADMINISTRATION, http://www.fda.gov/Radiation-EmittingProducts/RadiationEmittingProductsandProcedures/MedicalImaging/MedicalX-Rays/ucm115317.htm

[3]Kyphoplasty is a procedure used on patients with compression fractures in the spine and offers the potential to restore bone height in the vertebra and reverse deformity of the spine.  A patient undergoing kyphoplasty lies face down while the physician advances a thin tube into the fractured vertebra from an incision in the back.  Through the tube, the physician drills a small hole into the bone and into its soft center, providing a pathway for the physician to insert a small balloon into the interior of the bone, which is then inflated.  This pushes apart the caps of the vertebra and restores the vertebra to its original shape as much as possible. The balloon is then deflated and then removed, leaving a cavity that the physician fills with bone cement.  MAYO CLINIC, http://www.mayoclinic.org/vertebroplasty/kyphoplasty.html

[4]Kyphotic curvature refers to a forward rounding of the upper back; the term "kyphosis" refers to an exaggerated rounding (more than 50 degrees), which is also called "round back" or "hunchback."  MAYO CLINIC, http://www.mayoclinic.com/health/kyphosis/DS00681

[5]Paraspinous musculature refers to the muscles adjacent to the spinal column. NATIONAL INSTTIUTE OF HEALTH, MEDICAL DICTIONARY, http://www.nlm.nih.gov/medlineplus/mplusdictionary.html

Motor strength, coordination, gait, sensation, and reflexes were within normal limits.  Dr. Kent diagnosed a seizure disorder, secondary to sleep deprivation and alcohol withdrawal; and psychiatric residual of seizure involving nightmares and panic attacks.   It was Dr. Kent's opinion that the seizures were due to overuse of alcohol and sleep deprivation, and that the only restrictions (Plaintiff) had were preclusions from excessive alcohol intake and sleep deprivation.

On December 5, 2007, (Plaintiff) said the pain was better controlled.

During a September 5, 2008 office visit, (Plaintiff) said he had maintained his pain with Vicodin, and he was actively swimming and walking for exercise.  He said his pain worsened if he worked on his computer too long or did too much yard work.  (Plaintiff) also reported a history of seizures; however, he said he had no more seizures since 2004 and was not taking anti-seizure medication.  He complained of having nightmares since being assaulted as a child, but he denied depression.  On examination, (Plaintiff)'s heart and lung sounds were normal.  (Plaintiff) had tenderness around T7 of the thoracic spine; otherwise, the examination was normal. An October 16, 2008 physical examination revealed only mild pain with motion of the thoracic spine. (Plaintiff) had a full range of motion of the cervical spine, lumbar spine, left shoulder, and lower extremities.  During a follow-up visit for pain medication on November 20, 2008, (Plaintiff) reported his pain was well controlled; he had improved function, no medication side effects, and no sleep disturbance from pain.  On January 20, 2009, (Plaintiff) said he wanted a surgical consultation as spasms in the area of the thoracic spine, but a full range of motion of the lumbar spine and cervical spine.

An October 27, 2009 MRI of the thoracic spine showed anterior wedging and prominent compression deformity at T7, consistent with the prior injury; mild compression deformities at T8 and T9, and degenerative disc disease with the slight indentation to the left ventral aspect of the spinal cord at T6-T7.  An MRI of the lumbar spine revealed degenerative disc disease and osteophytosis[6] at L4-L5, resulting in left lateral recess stenosis[7] and

---

[6]Osteophytosis is another name for the condition known as "bone spurs," which are projections that develop along the edges of bones where bones meet each other (such as in between vertebrae).  MAYO CLINIC, http://www.mayoclinic.com/health/bone-spurs/DS00627

[7]Lateral Recess Stenosis occurs when the side of the spinal canal has been restricted, or narrowed by an abnormailty within the spine's structure.  LASER SPINE INSTITUTE, (continued)

11cv1372

narrowing of the neural foramina,[8] and trace L3-L4 disc disease.

On October 20, 2009, (Plaintiff) said he was happy with the pain relief with Vicodin but worried that it was affecting his liver.  (Plaintiff) denied numbness and tingling of the legs.  (Plaintiff) said he did not want to take anti-seizure medications; and he did not want to take anti-hypertensive medications because even though (Plaintiff)'s blood pressure was elevated on the date of the examination, he said it was normal when he took it at the pharmacy.  (Plaintiff) rated his level of pain as 6 on a scale of 1-10, but he reported improved functioning, and he denied medication side effects or sleep disturbance due to pain.  On examination, (Plaintiff)'s kyphosis was moderate and he had tenderness at T8-9 and L3-4 of the thoracic and lumbar spine.  However, he had no muscles (Sic) spasms; range of motion was normal; and straight leg raising was negative.

(Plaintiff) also has a history of hepatitis C and mildly elevated liver enzymes, but an abdominal ultrasound was negative and showed no evidence of liver disease, and (Plaintiff) has not been treated for this condition.  At the office visit on October 20, 2009, (Plaintiff)'s current treating source noted only to monitor this condition on an annual basis.  Thus, the hepatitis C is considered to be non-severe as it has no more than a minimal effect on (Plaintiff)'s ability to engage in work-related activities.

Regarding (Plaintiff)'s alleged mental impairments, the record shows that (Plaintiff) has complained of anxiety, nightmares, and a fear of having a seizure while driving.  (Plaintiff) reportedly took Librium[9] for a short time after the May 2004 seizure, but there is no record that (Plaintiff) has sought psychiatric treatment.

On May 5, 2007, Dr. Jason Yang conducted psychiatric consultative examination of (Plaintiff).  (Plaintiff) complained of excessive worry, but he denied psychiatric treatment or taking psychiatric medications.  On

---

(continued)
http://www.laserspineinstitute.com/back_problems/spinal_stenosis/lateral_recess

[8]Narrowing of the neural foramina occurs when the nerve passageways in the spine (on the right and left side) have less space than they previously did, causing compression or pinching of the nerves.  Laser Spine Institute, http://www.laserspineinstitute.com/back_problems/foraminal_narrowing/types/bilateral

[9]Librium (Chlordiazepoxide) is used to relieve anxiety and to control agitation caused by alcohol withdrawal.  NATIONAL CENTER FOR BIOTECHNOLOGY INFORMATION, U.S. LIBRARY OF MEDICINE, www.nlm.nih.gov/pubmedhealth/PMH0000568

11cv1372

examination, (Plaintiff) made good eye contact and had no psychomotor changes. (Plaintiff) denied hallucinations. His attitude was cooperative. Attention, speech, sensorium cognition, ability to perform simple calculations, memory, fund of knowledge, mood, affect, thought content, and thought process were all intact. Dr. Yang diagnosed an adjustment disorder with anxiety and assessed a GAF of 65.[10/] It was all his opinion that (Plaintiff) could perform basic work-related activities without any mental impairment. The (ALJ)agrees and adopts Dr. Yang's opinion, which is consistent with the medical evidence.

Apart from objective findings ,there are substantial reasons pursuant to SSR 96-7p to conclude that (Plaintiff) remains able to engage in a wide range of work-related activities. At the hearing, the claimant responded well to questioning. He moved around without difficulty; he did not appear uncomfortable; and he walked without any problems. (Plaintiff) has hepatitis C, but it has not caused problems. (Plaintiff) currently does not have any seizures, and it appears this condition is related to (Plaintiff)'s alcohol use. (Plaintiff) claims he is afraid to work because he fears he will have seizures. However, (Plaintiff) does household chores, shops, gardens, listens to music, works on the computer, spends time with his girlfriend and helps care for her children, reads the newspaper, watches television, and shops. He reportedly has a good relationship with family and friends. (Plaintiff) reported recreational activities, including hiking and camping. (Plainiff) has minimized his use of alcohol; however, the record shows that most of his problems, including his seizure episodes, were related to his alcohol consumption. (Plaintiff) was also intoxicated at the time of the June 2006 motorcycle accident, and he lost his license after being convicted to (sic) driving under the influence. The examining physicians have noted that alcohol has caused or contributed to (Plaintiff)'s problems. (Plaintiff) takes Vicodin, and he stated it has helped with the pain. All of the aforementioned factors are inconsistent with the presence of an incapacitating or debilitating medical condition.

As for the opinion evidence, the State Agency review physicians determined that (Plaintiff) could perform light exertion, but that (Plaintiff) was limited to

---

[10/] According to the Diagnostic and Statistical Manual of Mental Disorders (DSM-IV) (4th ed., 1994), A GAF score of 61-70 indicates some mild symptoms, such as depressed mood and mild insomnia, or some difficulty in social occupational, or school function, such as occasional truancy or theft within the household, but generally functioning pretty well, and has some meaningful interpersonal relationships.

11cv1372

standing and walking for 2 hours rather than 6 hours, and that (Plaintiff) had preclusions from the following: climbing ladders, ropes, or scaffolds; more than occasional climbing of ramps and stairs; more than occasional stooping, crouching, and crawling; and all exposure to hazardous conditions such as working at heights or with dangerous machinery. The State Agency review psychiatrists concluded that (Plaintiff) did not have a severe mental impairment. The ALJ concurs and adopts these findings, which are consistent with the overall medical evidence, except for the standing and walking limitations. The record does not show that (Plaintiff) has neurological deficits in the lower extremities. The functional capacity adopted herein takes full account of the mild objective findings, incorporates the restrictions supported by objective evidence, and accords the claimant every reasonable benefit of the doubt.

Karianne Lamoreaux, (Plaintiff)'s girlfriend, completed a Third Party Report in which she reported the following information: she and (Plaintiff) spend all of their time together. (Plaintiff) spends his days eating, reading the newspaper, watching television, either walking or riding in a car to a mini-market, lying down, more television watching, and then going to sleep. (Plaintiff) has bad dreams, insomnia, and pain. It is difficult for him to bend over and put on his socks and shoes. He sometimes asks for help washing his back. (Plaintiff) can make sandwiches and frozen dinners, but nothing that involves standing for prolonged periods. He does house and yard work, including wiping counters, unloading the dishwasher, and checking the car fluids. He cannot do heavy or hard labor because of pain and immobility. He travels by walking and riding in a car. He shops 3-4 times a week for groceries, which takes him 1-2 hours. (Plaintiff) can handle finances. Hobbies include watching TV, reading newspapers, listening to music, and web surfing. He emails and phones friends and family, and socializes with Ms. Lamoreaux. He visits the library and does local shopping 3-4 times a week, and the couple does a driving outing on the weekends. (Plaintiff) has problems lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, concentrating, and interacting with others. Medications make his concentration fuzzy. He can walk for 10 minutes because he has to rest for 2-3 minutes. He can pay attention long enough to watch a 30 minute sitcom; he has no difficulty following written or oral instructions. (Plaintiff) interacts well with authority figures. His reactions to stress vary from good to poor; he cannot handle changes in a routine very well. He needs to constantly wear a back brace.

11

11cv1372

Much of what Ms. Lamoreaux reported is consistent with the overall medical evidence. However, the mention of concentration deficits is not supported by the record, and there is no evidence the claimant has significant anxiety such that he cannot withstand normal work stress and changes in a work place. Although (Plaintiff) does have lifting, carrying, walking, and standing restrictions, there is also no evidence that (Plaintiff)'s ability to perform a limited range of light exertion is further reduced than found herein. It is also noted that (Plaintiff) is supported by Ms. Lamoreaux, so she has a motive in secondary gain. More importantly any greater restrictions are not supported by the overall evidence of record.

6.   (Plaintiff) is capable of performing past relevant work as a sales person. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity.

In comparing the (Plaintiff)'s residual functional capacity with the physical and mental demands of this work, the ALJ finds that (Plaintiff) is able to perform it as actually and generally performed.

Although (Plaintiff) is capable of performing past relevant work, there are other jobs existing in the national economy that he is also able to perform. Therefore, the Administrative Law Judge makes the following alternative findings for step five of the sequential evaluation process.

(Plaintiff) was born on June 14, 1963 and was 42 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. (Plaintiff) has at least a high school education and is able to communicate in English. Transferability of job skills is not material to the determination of disability because using the Medical - Vocational Rules as a framework supports a finding that (Plaintiff) is "not disabled," whether or not (Plaintiff) has transferable job skills.

In the alternative, considering (Plaintiff)'s age, education, work experience, and residual functional capacity, there are other jobs that exist in significant numbers in the national economy that (Plaintiff) also can perform.

In determining whether a successful adjustment to other work can be made, the ALJ must consider (Plaintiff)'s residual functional capacity, age, education, and work experience in conjunction with the Medical - Vocational Guidelines. If (Plaintiff) can perform all or substantially all of the exertional demands at a given level of exertion, the medical-vocational rules direct a

conclusion of either "disabled" or "not disabled" depending upon (Plaintiff)'s specific vocational profile. When (Plaintiff) cannot perform substantially all of the exertional demands of work at a given level of exertion and / or has nonexertional limitations, the medical-vocational rules are used as a framework for decision-making unless there is a rule that directs a conclusion of "disabled" without considering the additional exertional and / or nonexertional limitation. If (Plaintiff) has solely nonexertional limitations, the Medical-Vocational Guidelines provides a framework for decision-making.

If (Plaintiff) had the same residual functional capacity to perform the full range of light work, considering (Plaintiff)'s age, education, and work experience, a finding of "not disabled" would be directed by Medical-Vocational Rule 202.21. However, the additional limitations have little or no effect on the occupational base of unskilled light work. A finding of "not disabled" is therefore appropriate under the framework of this rule. (Plaintiff)'s seizure precautions do not impose significant limitations which would preclude him from performing thousands of other existing jobs in the regional and national economy.

7.   (Plaintiff) has not been under a disability, as defined in the Social Security Act, from June 11, 2006, through the date of this decision.

IV

STANDARD OF REVIEW

A district court may only disturb the Commissioner's final decision "if it is based on legal error or if the fact findings are not supported by substantial evidence." Sprague v. Bowen, 812 F.2d 1226, 1229 (9th Cir. 1987); see Villa v. Heckler, 797 F.2d 794, 796 (9th Cir. 1986). Substantial evidence is defined as relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Matthews v. Shalala, 10 F.3d 678, 679 (9 th Cir. 1993). A reviewing court's role is not to determine whether the record can support the claimant's alternative view of the evidence, but whether substantial evidence supports the ALJ's conclusions. Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is

13

susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld.").

The court cannot affirm the Commissioner's final decision simply by isolating a certain amount of supporting evidence. Rather, the court must examine the administrative record as a whole. <u>Gonzalez v. Sullivan</u>, 914 F.2d 1197, 1200 (9th Cir. 1990). Furthermore, the Commissioner's decision must be set aside, even if supported by substantial evidence, if improper legal standards were applied in reaching that decision. <u>See</u>, <u>e.g.</u>, <u>Benitez v. Califano</u>, 573 F.2d 653, 655 (9th Cir. 1978).

V

<u>SUMMARY OF APPLICABLE LAW</u>

Title II of the Social Security Act (hereinafter, "Act"), as amended, provides for the payment of insurance benefits to persons who have contributed to the program and who suffer from physical or mental disability. 42 U.S.C. § 423(a)(1)(D). Title XVI of the Act provides for the payment of disability benefits to indigent persons under the Supplemental Security Income (SSI) program. § 1382(a). Both titles for the Act define "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months…" <u>Id.</u> The Act further provides that an individual:

> … shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or

whether he would be hired if he applied for work.  42 U.S.C. § 423(d)(2)(a).

The Secretary of the Social Security Administration has established a five-step sequential evaluation process for determining whether a person is disabled.  20 C.F.R. §§ 404.1520, 416.920.

Step one determines whether the claimant is engaged in "substantial gainful activity."  If he is, disability benefits are denied.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If he is not, the decision maker proceeds to step two.

Step two determines whether the claimant has a medically severe impairment or combination of impairments.  That determination is governed by the "severity regulation," which provides in relevant part:

> If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activites, we will find that you do not have a severe impairment and are, therefore, not disabled. We will not consider your age, education, and work experience. §§ 404.1520(c), 416.920(c).

The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. §§ 404.1521(b), 416.921(b).  Such abilities and aptitudes include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;: "[c]apacities for seeing, hearing, and speaking;" "[u]nderstanding, carrying out, and remembering simple instructions;" "[u]se of judgment;" "[r]esponding appropriately to supervision, co-workers, and usual work situations;" and "[d]ealing with changes in a routine work setting."  Id.  If the claimant does not have a severe impairment or combination of impairments, the disability claim is denied.  If the impairment is severe, the evaluation proceeds to step three.

11cv1372

1  Step three determines whether the impairment is equivalent to one
2  of a number of listed impairments that the secretary acknowledges are so
3  severe as to preclude substantial gainful activity.   20 C.F.R. §§
4  404.1520(d), 416.920(d).   If the impairment meets or equals one of the
5  listed impairments, the claimant is conclusively presumed to be
6  disabled.   If the impairment is not one that is conclusively presumed to
7  be disabling, the evaluation proceeds to step four.

8  Step four determines whether the impairments prevent the claimant
9  from performing work he has performed in the past.   If the claimant is
10 able to perform his previous work, he is not disabled.   20 C.F.R. §§
11 404.1520(e), 416.920(e).   If the claimant cannot perform his previous
12 work, the evaluation proceeds to step five.

13 Step five, the final step of the process, determines whether he is
14 able to perform other work in the national economy in view of his age,
15 education, and work experience.   The claimant is entitled to disability
16 benefits only if he is not able to perform other work.   20 C.F.R. §§
17 404.1520(f), 416.920(f).

18                                    VI

19                              DISCUSSION

20 A.   THE ALJ ARTICULATED CLEAR AND CONVINCING REASONS TO REJECT
          PLAINTIFF'S SUBJECTIVE SYMPTOM TESTIMONY.
21 Plaintiff argues that the ALJ failed to provide any clear reason to
22 reject his allegations of disabling impairment.   Defendant contends that
23 the ALJ provided several clear and valid reasons for not accepting
24 Plaintiff's subjective statements about the intensity, persistence, and
25 limiting effects of his symptoms (Tr. 16-20).

26 An ALJ cannot be required to believe every allegation of
27 disability, or else disability benefits would be available for the
28 taking, which would be contrary to the Act.   Fair v. Bowen, 885 F.2d

                                    16

597, 603 (9th Cir. 1989).   Congress expressly prohibits granting disability benefits based on subjective complaints.   42 U.S.C. § 423(d)(5)(A) ("An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability."); 20 C.F.R. § 404.1529(a) (an ALJ will consider claimant's statements about pain or other symptoms but they will not alone establish [disability]").   As such, the ALJ properly discounts credibility if he makes specific credibility findings that are properly supported by the record and sufficiently specific to ensure a reviewing court that he did not "arbitrarily discredit" the testimony.   Bunnell v. Sullivan, 947 F.2d 341, 345-46 (9th Cir. 1991); Social Security Ruling 96-7p, 1996 WL 374186 (finding must be sufficiently specific to make clear to the claimant and to any reviewing court  the weight the ALJ gave to the individual's statements and the reasons for that weight").

The ALJ may consider a variety of credibility factors, including "ordinary techniques of credibility evaluation;" the claimant's daily activities; nature, location, onset, duration, frequency, radiation, and intensity of pain or other symptoms; precipitating and aggravating factors; type, dosage, effectiveness, and adverse side-effects of any medication; treatment, other than medication; functional restrictions; unexplained, or inadequately explained, failure to seek or follow treatment.   Bunnell, 947 F.2d at 346-47.

Here, the ALJ enumerated several specific credibility factors.   He found that, " [a]part from objective findings, there are substantial reasons... to conclude that the claimant remains able to engage in a wide range of work-related activities" (Tr. 19).   He properly considered a variety of credibility factors before he determined that further

limitation beyond the residual functional capacity for a reduced range of light work was not warranted (Tr. 20).

For example, the ALJ noted Plaintiff's activities of daily living. See Thomas v. Barnhart, 278 F.3d 947, 958-59 (ALJ properly considers inconsistencies between claimant's testimony and daily activities). Plaintiff told the examining psychiatrist that he did household chores, shopped, gardened, listened to music, read the newspaper, watched television, worked on the computer, and socialized with his girlfriend (Tr. 20). Plaintiff also told the psychiatrist that his current recreational activities included hiking and camping (Tr. 20).

The ALJ also reasonably relied on his observation of Plaintiff at the hearing (Tr. 19). See Drouin v. Sullivan, 966 F.2d 1255, 1258-59 (9th Cir. 1992) (holding, that along with other evidence, an ALJ's observations during the hearing can constitute substantial evidence supporting his credibility assessment). He noted that Plaintiff responded well to questioning, moved around without difficulty, sat comfortably throughout the hour long hearing, and walked without any problems (Tr. 19).

Next, the ALJ noted that Plaintiff's seizure activity was tied to excessive drinking (Tr. 17), and that Plaintiff made inconsistent statements about the contributory nature of alcohol (Tr. 20). For instance, Plaintiff told the ALJ that he only had a "couple" of beers prior to his September 2004 seizure and that he did not believe alcohol contributed to his problems (Tr. 36). However, the ALJ explained that "the record shows that most of his problems, including his seizure episodes, were related to his alcohol consumption ... [he] was also intoxicated at the time of the June 2006 motorcycle accident, and he lost his license after [pleading guilty] to driving while under the

influence... [and] the examining physicians have also noted that alcohol has caused or contributed to the claimant's problems" (Tr. 20). Congress expressly prohibits granting disability benefits if alcohol use is "material" to the claimant's impairments. 42 U.S.C. §§ 423(d)(2)(c), 1382c(a)(3)(J).

Additionally, the ALJ observed that Plaintiff's back treatment had been conservative, and that the medication he took effectively controlled his pain (Tr. 20). See Warre v. Comm'r, 439 F.3d 1001, 1006 (9th Cir. 2005) ("impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits"). Also, Plaintiff had not experienced seizures during his time of claimed disability and it appeared that his condition before this period was related to his alcohol use (Tr. 19-20). Plaintiff does not point to any error with the ALJ's findings regarding the objective medical evidence, which is a necessary baseline factor in the ALJ's credibility analysis. See 20 C.F.R. § 404.1529(a) (in evaluating symptoms the ALJ will consider "medical history, the medical signs and laboratory findings"); Bunnell, 947 F.2d at 344 (in evaluating credibility, the ALJ should first consider objective medical evidence and then consider other factors). The ALJ properly discussed the lack of objective evidence to support Plaintiff's allegations (Tr. 16-19).

Regarding back pain, the ALJ summarized Plaintiff's history of back pain and impairment (Tr. 17-18). This evidence reveals that Plaintiff's pain was well controlled with medication; he was able to walk, swim, and take care of his daily activities. His pain was only exacerbated by activities such as running, or sitting or standing for "long" periods; he reported no sleep problems or medication side-effects (Tr. 425-33). This level of daily activity was inconsistent with Plaintiff's testimony

1  at the hearing where he described a "constant" level of disabling back

2  pain, medication side-effects that significantly impaired his

3  concentration, and that he sometimes could not dress himself. (Tr. 41,

4  47, 49-52, 54).   Because Plainff remained "capable of caring for all

5  his own personal needs, the performance of his routine household

6  maintenance and shopping chores", and even remained capable of

7  activities such as hiking, camping, and swimming, it was reasonable for

8  the ALJ to conclude that the claimant's pain does not prevent the

9  claimant from working.

10     Regarding seizures, Plaintiff admitted that they were infrequent

11  and not an ongoing problem (Tr. 40).   In September 2008, he told a

12  treating physician that he had not had a seizure since 2004 and did not

13  take any seizure medication (AR 437).   The examining neurologists opined

14  that Plaintiff's seizure activity in 2004 was due to lack of sleep and

15  alcohol consumption (Tr. 208, 237).   Dr. Kent also found "no reasonable

16  medical basis" for suspecting that Plaintiff's seizures were related to

17  a neurological issue such as epilepsy (Tr. 235).   The ALJ concluded that

18  Plaintiff had not had seizures during his time of claimed disability and

19  it appeared that his condition before this time was related to alcohol

20  use (Tr. 19-20).   He reasonably determined that Plaintiff's allegations

21  of disabling limitations were unsupported and not fully credible.   See

22  Burch, 400 F.3d at 681 ("[a]lthough a lack of medical evidence cannot

23  form the sole basis for discounting pain testimony, it is a factor that

24  the ALJ can consider in [the] credibility analysis").

25     The ALJ provided numerous reasons to support his conclusion that

26  Plaintiff's back pain and seizure disorder limited him to a residual

27  functioning capacity for a reduced range of light work, but further

28  limitation was not warranted (Tr. 15-20).   Substantial evidence further

1  supported the ALJ's finding that Plaintiff could return to his past
2  relevant work as a salesperson (Tr. 21).

3       Accordingly, the Court RECOMMENDS that Plaintiff's Motion for
4  Summary Judgment be DENIED and Defendant's Motion for Summary Judgment
5  be GRANTED.

6                                     VII

7                      CONCLUSION AND RECOMMENDATION

8       After a review of the record in this matter, the undersigned
9  Magistrate Judge RECOMMENDS that Plaintiff's Motion for Summary Judgment
10 be DENIED and Defendant's Motion for Summary Judgment be GRANTED.

11      This Report and Recommendation of the undersigned Magistrate Judge
12 is submitted to the United States District Judge assigned to this case,
13 pursuant to the provision of 28 U.S.C. §¤ 636(b)(1).

14      IT IS ORDERED that no later than April 13, 2012, any party to this
15 action may file written objections with the Court and serve a copy on
16 all parties.  The document should be captioned "Objections to Report and
17 Recommendation."

18      IT IS FURTHER ORDERED that any reply to the objections shall be
19 filed with the Court and served on all parties no later than April 27,
20 2012. The parties are advised that failure to file objections within the
21
22
23
24
25
26
27
28

specified time may waive the right to raise those objections on appeal of the court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).


DATED:  March 23, 2012


_____
Hon. William V. Gallo
U.S. Magistrate Judge